NORTHERN OHIO TELEPHONE COMPANY, APPLICATION, IN RE.

Public Utilities Commission.

No. 26681.  Decided May 21, 1958.

*Messrs. Power, Griffith & Jones*, by *Mr. John Robert Jones*, for Applicant, Northern Ohio Telephone Company.

*Mr. Daniel W. Reddin, III*, solicitor, for the City of Bowling Green, Protestant.

*Mr. Henry E. Young*, for the City of Norwalk, Protestant.

*Mr. James E. Nelson*, solicitor, for the City of Ashland, Protestant.

*Mr. Harold Bordner*, for the Wood County Farm Bureau, Protestant.

*Hon. Ray Durdel*, mayor, for the Village of Elmore, Protestant.

*Mr. George Brandow*, for the Businessmen of Elmore, Protestants.

*Mr. Eldon Leow*, for the Ottawa County Farm Bureau, Protestant.

*Mr. Leon Priess*, for the Chamber of Commerce of Bowling Green, Protestant.

*Mr. Roy D. Scott*, for the Utopian Grange of Delaware County, Protestant.

*Mr. Robert Bash*, for the Medina County Farm Bureau, Protestant.

*Mr. Edward N. Turpish*, on his own behalf as an individual, Protestant.

*Mr. William B. Saxbe*, attorney general, by *Mr. James F. DeLeone*, assistant attorney general and commission counsel, for the Public Utilities Commission.

*Summary of Findings in Attached Order of the Public Utilities Commission of Ohio Relative to Northern Ohio Telephone Company's Application to Increase Telephone Rates, Case No. 26,681.*

The Public Utilities Commission of Ohio today reduced by 20% the over-all rate increases applied for by the Northern Ohio Telephone Company of Bellevue, Ohio. The principal reduction was in the Company's proposed local exchange rates affecting the Company's 85,000 subscribers served by its 67 exchanges situated in 24 north-central Ohio counties—that reduction being upwards of 22% or approximately $265,000 of the Company's proposed increase in its annual local exchange gross revenues.

The P. U. C. O. authorized Northern Ohio to increase its public pay phone rates from 5c to 10c, which latter 10c rate has been in effect throughout most of Ohio. It also allowed the Company a 1.69% over-all increase in its toll charges, the increased toll rates being applicable *only* to those intra-company toll calls made in their entirety over facilities of Northern Ohio. These new rates likewise place Northern Ohio's toll rates at the same level being charged by most other telephone companies in Ohio.

The new rates will *not* go into effect until set by a later Order of the Commission after the Company has submitted to the Commission for its verification a detailed breakdown of the revenues anticipated to be collected under the new level of rates fixed today by the Commission's Order. In this connection, Northern Ohio had sought new rates to yield an increase of $1,347,514 in its annual gross revenues. The Commission's Order reduced this proposed increase by $265,000 thereby limiting the Company to increased annual gross revenues of about $1,083,119 or an aggregate increase in such revenues of 13.27%. This will afford the Company a net annual return of approximately $2,037,000 (after payment of all operating expenses, including federal income and other taxes). It is to be noted that

over 50% of this $1,083,119 increase in gross revenues goes to pay federal income and other taxes.

The Commission's Order cut by 10½ million dollars the rate base valuation proposed by the Company's initial Application filed on November 21, 1956. (pp 5-7 of PUCO Order.) The reproduction cost new less existing depreciation value of the telephone properties as of August 31, 1957, was ascertained by the Commission to be $33,674,548 *after* the inclusion in its valuation by the Company's Supplemental Application of gross additions with an aggregate book cost of $7,783,013 for the additional 18-months period from January 1, 1956 to August 31, 1957, covered by this new Application filed on October 9, 1957.

The Commission determined 6.05% to be a fair annual rate of return for this Company and applied that percentage to the rate base of $33,674,548 which produced the net annual return of approximately $2,037,000. This so-called annual return of $2,037,000 is the amount of net revenues from which the Company pays (1) the interest charges on its bonded indebtedness, (2) its annual preferred stock dividends, and (3) its common stock dividends and meets its contingencies and earned surplus requirements.

In matters relating to rate classifications the Commission required the Northern Ohio Telephone Company to investigate expansion of the Brunswick base rate area and to file with the Commission within 60 days after the effective date of its Order, the results of its investigation. The Commission also approved the banding system for local exchange rates which groups by exchanges the number of telephones in the local calling area that may be reached without the payment of toll charges.

In service matters the Commission stated that applications for telephone service or regrades of telephone service should be filled promptly by the Company and that with the rate increases granted, this Company should be able to continue to attract the capital necessary to do the job of rendering efficient, effective telephone service that is at all times adequate in quality and quantity throughout its operating area.

The Commission also said it would consider and investigate in separate hearing, if requested, the propriety of the Company's present practice of terminating by automatic equipment local calls after the passage of seven minutes, which practice

was challenged by Wadsworth exchange subscribers during the rate hearings.

## Finding and Order

The Commission coming now to consider the above entitled Application and the exhibits attached thereto; the matters contained in the Report of the Secretary, issued pursuant to the provisions of Section 4909.18, Revised Code; the testimony and exhibits adduced at the public hearings; and, being otherwise fully advised in the premises and in compliance with Section 4903.09, Revised Code, hereby renders its Opinion and Findings.

*Nature of Proceeding—*

The Applicant, Northern Ohio Telephone Company, seeks to increase local exchange rates and charges and certain intra-company toll rates and charges to subscribers throughout its operating area.

*History of Proceedings—*

On November 21, 1956, the Northern Ohio Telephone Company, Applicant herein, filed with this Commission an Application seeking the authorization of the Commission to increase rates and charges for telephone service rendered by it within the State of Ohio, and in accordance with alphabetically enumerated paragraphs (A), (B) and (C) of aforecited Section 4909.18, Revised Code, filed with and attached to its Application exhibits purporting to represent:

(A) A detailed inventory and appraisal as of January 1, 1956, of its property used and useful in the rendition of telephone service;

(B) A complete operating statement of its last fiscal year, being the calendar year 1955;

(C) Local service areas or rate bands by exchanges, and present and proposed local service rates by bands by exchanges;

(D) Proposed General Exchange Tariff, P. U. C. O. No. 2;

(E) Summary of proposed increased rates and charges; and

(F) Pro forma income statement as of January 1, 1955.

By Motion filed December 4, 1956, Applicant requested the Commission to issue an Order approving a form of proposed legal notice attached to the Motion and authorization to publish

said legal notice in accordance with the provisions of said Section 4909.19, Revised Code.

Under date of December 7, 1956, the Commission issued its Order approving the form of legal notice submitted and authorized publication to be made.

Pursuant to the prescription of aforesaid Section 4909.19, Revised Code, and orders of the Commission, an investigation of the matters set forth in said Application was caused to be made by the Secretary of the Commission. Immediately precedent to the contemplated issuance of the Secretary's Report, containing the findings resulting from the investigation of the Commission's technical staff, the Commission was advised that Applicant intended to file a Supplemental Application. Thereafter, on October 9, 1957, The Northern Ohio Telephone Company filed with this Commission a Supplemental Application seeking the authorization of the Commission to increase rates and charges for the telephone service rendered by it within the State of Ohio and filed therewith exhibits purporting to show:

(A-1) Record of gross additions, gross removal and net additions to plant for the period January 1, 1956, to December 31, 1956;

(A-2) Record of gross additions, gross removal and net additions to plant for the period January 1, 1957, through August 31, 1957.

(B-1) Earnings Statement, January 31, 1956, to December 31, 1956;

(C-1) Local service area or rate band by exchanges and present and proposed local service rates by bands and by exchange;

(D-1) Proposed General Exchange Tariff, P. U. C. O. No. 2;

(E-1) Summary of proposed increased rates and charges; and,

(F-1) Pro forma Income Statement for the period September 1, 1956, to August 31, 1957.

Concommitantly with the filing of its Supplemental Application on October 9, 1957, Applicant filed a Motion requesting (1) the Commission's approval of a proposed form of legal notice to be published in accordance with the provisions of aforecited Section 4909.18, Revised Code, and (2) an order of

the Commission approving the exhibits filed with the Supplemental Application as being in compliance with those exhibits prescribed by paragraph (A), (B) and (C) of said Section 4909.18, Revised Code.

On October 18, 1957, the Commission by Entry assigned for public hearing as of October 23, 1957, the aforesaid Motion filed by Applicant with its Supplemental Application, which hearing was thereafter held before the Commission as scheduled. (T1-T13)

On October 24, 1957, the Commission issued its Order approving the form of legal notice and authorizing the publication thereof, and scheduling for further hearing as of November 12, 1957, that portion of Applicant's Motion seeking the Commission's determination with reference to the exhibits attached to the Supplemental Application, which hearing was held as scheduled. (T14-T37)

On December 4, 1957, the Commission issued an Order granting the latter portion of Applicant's Motion thereby approving for filing the exhibits attached to the Supplemental Application as provided by aforesaid Secton 4909.18, Revised Code.

Pursuant to the prescriptions of aforecited Section 4909.19, Revised Code, and orders of the Commission, an investigation of the matters set forth in the Supplemental Application was caused to be made by the Secretary of the Commission and the Report thereof, containing the findings of the Commission's engineering and accounting staffs, was filed on December 26, 1957, and served by registered mail upon all municipalities and other interested parties within Applicant's service area as provided by said Section 4909.19, Revised Code.

This matter was assigned for public hearing upon its merits before the Commission at 11:00 a. m., on February 24, 1958, and continued through February 25 and February 26, 1958. (T38-T461)

*Discussion—*

## 1. Rate Base.

The Applicant, Northern Ohio Telephone Company, submitted with its Application a detailed inventory and appraisal of its plant and property used and useful in the rendition of telephone service as of January 1, 1956. The depreciated repro-

duction cost new valuation thereof estimated by the Application and as ascertained by the Company's engineering consultants may be summarized as follows:

| | |
|---|---|
| Reproduction Cost New | $44,664,846 |
| *Less* Existing Depreciation (10.89%) | 5,308,466 |
| R. C. N. L. D. | $39,356,380 |

The Commission's Engineering Staff's independent investigation disclosed that Applicant's R. C. N. (Reproduction Cost New) valuation as of January 1, 1956, should be adjusted in the following recommended particulars:

*Reductions*

| | |
|---|---|
| Corrections of Unit Costs | $ 4,035,965 |
| Paving | 386,405 |
| Drops | 14,259 |
| Aerial Wire | 666,371 |
| Miscellaneous | 47,942 |
| Corrections of Overheads | 4,965,594 |
| Sub-Total, Reductions | $10,116,536 |

*Additions*

| | |
|---|---|
| Paving, Hard | $ 117,349 |
| Paving, Soft | 65,176 |
| Rocks, Excavation | 15,580 |
| Sub-Total, Additions | $ 198,105 |
| Total Reduction of Applicant's Proposed R. C. N. Valuation.. | $9,918,431 |

The recommended findings resulting from the Engineering Staff's field analyses and other studies disclosed further that the existing depreciation upon Applicant's plant and property amounted to 16.41% or $5,700,267 upon the Staff's estimated R. C. N. valuation of that property as of January 1, 1956. This was a reduction aggregating 5.52% in the percent condition

estimated by the Company's engineering consultants and by application to the reduced R. C. N. valuation determined by the Commission's engineers, resulted in an additional value reduction of $391,801.00. The Engineering Staff's recommended valuation estimates as of January 1, 1956, may be summarized as follows:

| | |
|---|---|
| Reproduction Cost New | $34,746,405 |
| *Less* Existing Depreciation (16.41%) | 5,700,267 |
| R. C. N. L. D. | $29,046,138 |

It is to be noted that according to the findings of the Commission's Engineering staff, the Applicant seemingly overstated in its inventory and appraisal as of January 1, 1956, the reproduction cost new valuation of its plant and property by $9,919,431. Together with the further reduction effected by the staff engineers' determined per cent condition of 83.59% (compared to Applicant's proposed 89.11%), the aggregate reduction in the R. C. N. L. D. valuation of Applicant's property resulting from the engineers' findings amounted, therefore, to $10,310,242.00, as of the initially fixed date certain.

The Supplemental Application's changing of the date certain for valuation purposes from January 1, 1956 to August 31, 1957, necessitated (1) removing from the R. C. N. valuation of January 1, 1956, that property which had been retired in the interim between January 1, 1956 and August 31, 1957, at the valuation level of the former date, (2) trending the surviving property from the January 1, 1956, valuation level to the August 31, 1957, valuation level, (3) trending the recorded additions made in the interim between January 1, 1956 and August 31, 1957 to the R. C. N. valuation level of the latter date, and (4) redetermining the existing depreciation of Applicant's property as of August 31, 1957, the new date certain.

The Engineering staff's recommended findings of the estimated depreciated R. C. N. valuation of Applicant's plant as of August 31, 1957, may be summarized as follows:

| | |
|---|---|
| Reconstruction Cost New | $40,091,164 |
| *Less* Existing Depreciation (16.01%) | 6,416,616 |
| R. C. N. L. D. as of August 31, 1957 | $33,674,548 |

The Supplemental Application, it is to be observed, caused the inclusion in Applicant's R. C. N. valuation of gross additions at the aggregate book cost of $7,783,013 for the period between January 1, 1956 and August 31, 1957, and the trending of such additions by year to the August 31, 1957 valuation level by the application of appropriate conversion factors. Together with the redetermination of the existing depreciation at 16.01% as of this later date certain, the Commission engineers reached a recommended R. C. N. L. D. valuation of this Applicant's property in the sum of $33,674,548. It may be noted that this recommended staff valuation as of August 31, 1957, was still approximately $6,000,000 *less* than the January 1, 1956, R. C. N. L. D. valuation initially proposed in the first Application filed herein. The record evinces that neither the Applicant nor the Protestants entered objections to the valuation thus ascertained by the Commission's Engineering Staff.

The Engineering Staff, in recommending the so-called statutory rate base, added to the foregoing R. C. N. L. D. valuation as of August 31, 1957, an allowance of $545,000 for working capital, materials and supplies. Analyses of this Company's books and records would appear to indicate conclusively that its continuing Federal and other tax accruals will more than offset this allowance, thereby eliminating from the rate base said allowance of $545,000 for working capital and material and supplies pursuant to the dictates of the Ohio Supreme Court in the case of *City of Cincinnati* v. *P. U. C. O.*, 161 Ohio St., 395.

The Commission is of the opinion, and so finds herein, that the ascertained rate base for purposes of this proceeding is the reproduction cost new less existing depreciation valuation of Applicant's plant and property recommended by the Commission's Engineers in the amount of $33,674,548.00 as of the date certain, August 31, 1957.

### 2. *Rate of Return*

The next determination to be considered by the Commission herein is what percentage will represent a fair annual "rate of return" to this Applicant on the above-ascertained valuation of its property used and useful in rendering telephone utility service, and will thereby represent a yearly "reasonable compensation for the service rendered." *See* Section 4909.15, Revised Code; *City of Cleveland* v. *P. U. C. O.*, 164 Ohio

St., 442, 443-446; *City of Marietta* v. *P. U. C. O.*, 148 Ohio St., 173.

With the issuance of 30-year 5-⅛% First Mortgage Bonds in the principal amount of $3,000,000.00 which this Commission authorized for issuance shortly subsequent to the date certain herein, the percentage ratios of Applicant's capitalization is substantially as follows:

| | |
|---|---|
| *Equity* (Common Stock, Premium on Capital Stock, Surplus, and Installments paid on Capital Stock) | 41.72% |
| *Preferred Stock* | 22.34% |
| *Funded Debt* | 35.94% |

Historically, of course, the ratios of the respective components of this Company's capital structure have varied and it may be assumed that such ratios will vary likewise in the future according to the degree and character of the Company's capital demands and the status of national money market.

The rate of return opinion witnesses offered by the Applicant assumed, in part, for purposes of this testimony a hypothetical capitalization substantially comparable to that of the Applicant's, such illustrative capital structure being the mean ratios of 40% equity, 20% preferred stock, and 40% debt. Their opinion estimates of the current cost of equity capital as of the date certain, August 31, 1957, ranged from 9.25% to 10% for the foregoing hypothetical capitalization of a telephone utility company similarly situated to this Applicant.

While the testimony of the Applicant's rate of return witnesses suggested 6.6% and 7.35% rates of return, respectively, it is the opinion of the Commission, and it so finds herein, that a 6.05% percentage, *after* the payment of all operating expenses, including taxes and depreciation charges, will represent a fair annual rate of return on the Applicant's statutory rate base valuation of its property used and useful in rendering telephone utility service and will thereby yield a yearly reasonable compensation for the service proposed to be rendered. This rate of return will provide earnings of 8.94% on the proportionate equity equivalent of this Applicant utility's statutory rate base valuation after provision for all fixed charges, including

the interest and preferred stock dividend requirements on like proportionate funded debt and preferred stock equivalents of this Applicant's statutory rate base valuation.

### 3. Dollar Annual Return.

To determine the "dollar annual return" to which this applicant utility is entitled, application of the foregoing 6.05% rate of return against the afore-ascertained statutory rate base of $33,674,548 yields an annual dollar amount of return of approximately $2,037,000 *after* payment of *all* operating expenses, including taxes and depreciation charges. This "dollar annual return" of approximately $2,037,000:

(A) Would provide the Company with funds sufficient to meet the respective earnings requirements of the hypothetical capital components substantially equal to the above-ascertained statutory rate base (which amounts exceed Applicant's actual earnings requirements based on the existing capitalization), with an adequate balance for contingencies and surplus.

(B) Is equivalent to the return appearing in the Secretary's Report, to which Report, it may be noted, no objections were entered by this Applicant.

(C) Would enable the Company to pay 7% dividends on the proportionate hypothetical equity capital equivalent of the statutory rate base, assuming an approximate 70% pay-out ratio.

The Commission is of the opinion, therefore, and so finds herein, that this Applicant utility is entitled to an annual return of approximately $2,037,000.

### 4. and 5. Expenses and Gross Annual Revenues

In reaching the determination of the so-called "allowable gross annual revenues" and "annual expenses" of this Applicant under its existing rates and to ascertain the additional compensation, if any, required to produce for this Company the "rate of return" and resulting "dollar annual return" heretofore authorized, it is necessary to effect certain adjustments in the Company's actual revenues and expenses for the test period in order to reflect the station growth and known increases in the expense items of wages and salaries.

When a rate base is established and ascertained as of a year-end date certain, it purports to reflect the valuation of all of the utility's property used and useful as of that date certain;

perforce, where additional stations and properties are being added continually throughout the preceding 12-month test period or year, the annual revenues and expenses should be and are adjusted to reflect the level of stations in service at the end of that period or year as though such stations have been in service throughout the entire year.

Such adjustments under existing rates may be made by annualization of certain items of revenue and expense; ascertainment of the additional compensation, if any, required may be effected by projections of such revenue and expense items. The methods applied by the Commission herein are deemed appropriate to yield reasonably accurate estimations under the factual circumstances of this rate proceeding and will be set forth hereinafter in some detail.

In this connection, it is to be noted that a revision in one revenue item for these purposes will result accordingly in adjustments in revenues, expenses and return. The following reflects an adjustment in revenues to be effected herein under existing rates and charges and the resulting adjustments in expenses and return:

|  | Secretary's Report | Secretary's Report Adjusted |
|---|---|---|
| Revenues | $7,812,468 | $7,983,806 |
| Expenses | 6,443,679 | 6,504,073 |
| Return | $1,368,789 | $1,448,523 |
| Rate of Return (On rate base of $33,674,548) | 4.07% | 4.30% |

Schedule No. 1 of the Accounting Report in the Secretary's Report has annualized local service revenues by applying the present local exchange rates to the number of stations in service (viz., 102,409 stations) on the date certain, August 31, 1957, as though such stations had been in service for the entire test year. However, neither the message toll revenues or miscellaneous revenues were so annualized.

On the other hand, said Schedule No. 1 annualized all of the Company's operating expenses by inclusion of the increases in wages and salaries in effect as of August 31, 1957, in Ac-

counts Nos. 602-675 and by an upward adjustment of "Other Expenses" to reflect purportedly the additional expenses which would have been incurred had level of stations in service as of August 31, 1957, been in service throughout the 12-month test period. Corresponding adjustments were made, of course, in Federal income and other taxes by reason of the adjustments made in the revenue and operating expense items.

Mr. Henry, the President and General Manager of the Northern Ohio Telephone Company, testified that the Applicant is experiencing a continuing substantial gain in stations and that the 12-month period ending with the date certain herein evidenced a progressive monthly growth in net stations gained. He stated that for the first eight months of 1957, the Company realized an internal growth of 3,686 telephones or an average gain of 465 telephones per month. (T-84, 85) This continual gain in stations from September 30, 1956, to August 31, 1957, evinces, of course, that the revenues actually collected for this 12-month test period would be *less* than had the revenues been collected on the annualized basis of the 102,409 stations as of the date certain being in service throughout the test period. The following comparative data, showing the annual revenue per station for the respective twelve-month periods ending each month from September 30, 1956, to August 31, 1957, would appear to well confirm the allegations made by Mr. Henry in behalf of the expansion and kinetic growth of this Company:

| | | | Revenue | Average No. of Stations | Average Rev. per Station |
|---|---|---|---|---|---|
| 12-Mo's Ended | 8/31/57 | $7,757,363 | 99,502 | $77.96 |
| 12-Mo's Ended | 7/31/57 | 7,704,712 | 99,142 | 77.71 |
| 12-Mo's Ended | 6/30/57 | 7,653,957 | 98,934 | 77.36 |
| 12-Mo's Ended | 5/31/57 | 7,612,713 | 98,655 | 77.17 |
| 12-Mo's Ended | 4/30/57 | 7,577,936 | 98,213 | 77.16 |
| 12-Mo's Ended | 3/31/57 | 7,549,436 | 97,719 | 77.26 |
| 12-Mo's Ended | 2/28/57 | 7,508,853 | 97,237 | 77.22 |
| 12-Mo's Ended | 1/31/57 | 7,481,655 | 96,676 | 77.39 |
| 12-Mo's Ended | 12/31/56 | 7,427,942 | 96,109 | 77.29 |
| 12-Mo's Ended | 11/30/56 | 7,395,319 | 95,454 | 77.48 |
| 12-Mo's Ended | 10/31/56 | 7,351,360 | 95,043 | 77.35 |
| 12-Mo's Ended | 9/30/56 | 7,313,968 | 94,570 | 77.34 |

The Commission is of the opinion, therefore, and so finds herein, that the average annual revenue per station of $77.96 for the twelve-months period ending August 31, 1957, should be applied to the actual station level of 102,409 as of August 31, 1957, in order to obtain a reasonably accurate and sound estimate of Applicant's annual revenues under existing rates and charges. In light of the factual circumstances of this proceedings, this method would, in the opinion of the Commission best restate and reflect the annual revenues of this utility at the station level as of August 31, 1957.

In fact, the application of $77.96 as the average annual revenue per station might be said to be conservative in view of this Company's experience subsequent to the date certain herein. At the February 24, 1958, hearing of this case, Mr. Henry testified that from August 31, 1957 to January 1, 1958, the net gain in telephones realized by this Applicant was 2,018 or an average of 504½ telephones per month and, that the month of December had the highest station gain of any month during the calendar year 1957. He stated further that the new orders received in January totaled 462 telephones and that no decrease in orders had been evidenced. (T-84, 85) This progressive growth would appear to be substantiated by the following data which indicates that the average revenue per station continued to rise after the date certain of August 31, 1958:

*Period*

| | Revenue | Average No. of Stations | Average Rev. per Station |
|---|---|---|---|
| 12-Mo's Ended 12/31/57 | $7,975,372 | 101,575 | $78.14 |

The Commission is of the further opinion, and so finds herein, that the "annual expenses" and the "gross annual revenues" shown in Column (5), Schedule 1 of the aforesaid Accounting Report as set forth in the Secretary's Report, are reasonable and proper. It follows, accordingly that the total operating revenues of $9,246,925.45 as shown in Column (5) of aforesaid Schedule 1 properly represent the allowable "gross annual revenues" to be authorized herein. Although the "dollar annual return" is shown in the Secretary's Report to be ap-

proximately $2,037,000, the rate of return found by the Commission varies from that shown in the Secretary's Report by reason of the previous findings herein, including the downward adjustment made herein by the Commission in fixing the statutory rate base, this being evidenced as follows:

|  | Secretary's Report | Secretary's Report Adjusted |
|---|---|---|
| Revenues | $9,246,925 | $9,246,925 |
| Expenses | 7,210,606 | 7,210,606 |
| Return | $2,036,319 | $2,036,319 |
| Rate of Return | 5.95% | 6.05% |

The terms "increase in revenues" and "increase in rates" are usually considered to be synonymous. However, this may not always follow and the following tabulations are set forth herein to evidence the differentiations for the purposes of this proceeding.

*Increase in Revenue*

|  | Secretary's Report | Secretary's Report Adjusted |
|---|---|---|
| Required Revenue | $9,246,925 | $9,246,925 |
| Revenue at present rates | 7,812,467 | 7,983,806 |
| Increase in Revenue | $1,434,458 | $1,263,119 |

*Increase in Rates*

|  | Secretary's Report | Secretary's Report Adjusted |
|---|---|---|
| Increase in Revenue | $1,434,458 | $1,263,119 |
| *Less* estimated increase in Ohio Bell toll settlement | 90,000 | 180,000 |
| Increase in Rates | $1,344,458 | $1,083,119 |

The above estimates of $90,000 and $180,000 represent, respectively, an increase in anticipated revenues to the Applicant; but, they do not represent an increase in rates to the customers

of the Northern Ohio Telephone Company. The above $180,000 annual "increase in revenues" upward adjustment from the Company's estimate of $90,000 would appear to accord with this Commission's experience relative to the additional toll settlement agreements effected by other independent telephone companies within this State, said settlements being retroactive to December 31, 1955. Thus, the Company's $90,000 estimate not only appears to be most conservative in the Commission's judgment but there is no probative evidence adduced upon the record substantiating that estimate. The burden of proof, of course, rests squarely upon this Applicant.

The Commission is of the opinion, perforce, and so finds herein, that the estimate of the additional revenues to be realized by this Company from the subject toll settlement for the test period should be in the aggregate amount of $180,000 and that, accordingly, Applicant's proposed estimate should be increased by $90,000 for the purposes of this rate proceeding.

However, should Applicant wish to proffer evidence substantiating either its $90,000 or some other proposed estimate, or, in the event of the consummation of said toll settlement agreement, the Commission reserves the right to reconsider such matters and make whatever adjustments may then be indicated in this item or in other revenue and expense items in appropriate proceedings subsequent to the effective date of this Order.

The following tabulation reflects this adjustment of $180,000 annually in arriving at an estimate of Applicant's annual gross revenues, under existing rates and charges:

*Estimated annualized gross revenues under existing rates.*

| | |
|---|---|
| Revenues | $7,983,806 |
| Additional Revenues | 180,000 |
| Estimated annual gross revenues | $8,163,806 |

The Commission is of the opinion, and so finds herein, that the estimated annual revenues, under existing rates and charges of approximately $8,163,806, is insufficient to yield yearly reasonable compensation to this Applicant utility, as of the date certain of August 31, 1957. In conclusion, the Commission is of the opinion, therefore, and so finds herein, that this Applicant

is entitled to allowable annual gross revenues of approximately $9,246,925.

### 6. Authorized Rates and Charges

(A) Toll Rates

The Applicant proposes to file and make effective General Exchange Tariff P. U. C. O. No. 2, Section 6, Original Sheet No. 1, setting forth message toll telephone service, rules, regulations and tariffs which contains the proposed rate table increasing rates and charges on "toll messages handled from origination to destination exclusively over facilities of the Northern Ohio Telephone Company."

In Case No. 25,243 on the Commission's formal docket, this Commission investigated the practice of the various telephone companies concurring in the *Message Toll Telephone Service Tariff* of the Ohio Bell Telephone Company filed with the Public Utilities Commission of Ohio.

After lengthy hearings and deliberations, the Commission approved the practice followed by various telephone companies of concurring in the *Message Toll Telephone Service Tariff* of the Ohio Bell Telephone Company for the rates and charges to be assessed subscribers on all inter and intra-company calls *except on toll messages handled from origination to destination exclusively over the facilities of the individual independent telephone company.* For toll messages handled from origination to destination exclusively over the facilities of the individual independent telephone company, the Commission denied authorization of the practice of concurrence and required each company to file its own schedule of rates and charges for such toll messages.

The Northern Ohio Telephone Company, prior to the Commission's Finding and Order of July 14, 1955, and Supplemental Finding and Order of April 20, 1956, in aforecited Case No. 25,243, had been exacting the rates and changes set forth in the "rate table" on proposed General Exchange Tariff P. U. C. O. No. 2, Section 6, Original Sheet No. 1, for *toll messages handled from origination to destination exclusively over the facilities of the Northern Ohio Telephone Company.* After the Commission's Orders in Case No. 25,243 and pursuant thereto, the Northern Ohio Telephone Company filed General Exchange

tariff P. U. C. O. No. 1, Section 6, Fifth Revised Sheet No. 1, which set forth a table of rates for toll messages processed from origination to destination exclusively over the facilities of the Northern Ohio Telephone Company.

During the period the Commission was considering the propriety of such toll concurrence practices in 1955, the Northern Ohio Telephone Company represented to the Commission that the annual revenues of the company would be reduced by an estimated $55,000 if the Commission did not allow the practice of toll concurrence *on toll messages handled from origination to destination exclusively over the facilities of the Northern Ohio Telephone Company.*

In Exhibit E-1 attached to the Supplemental Application, and through the testimony of Mr. Todd, Secretary-Treasurer and General Auditor of the Northern Ohio Telephone Company, at Page 388 of the transcript, the Applicant estimates the additional revenues to be derived from increasing its rates and charges *on toll messages handled from origination to destination exclusively over the facilities of the Northern Ohio Telephone Company* as $55,000 annually. This estimate of $55,000, based upon a date certain of August 31, 1957, does not disclose any increase over the estimate in 1955, notwithstanding the fact that the Northern Ohio Telephone Company has experienced a continual station gain from 1955 to the date certain. It would appear that the amount collected *under the same rate schedule for toll messages handled from origination to destination exclusively over the facilities of the Northern Ohio Telephone Company* would be greater based upon a date certain of August 31, 1957, than the amount collected in 1955 in view of additional plant, property and subscribers added subsequent to 1955.

The Commission finds accordingly that the Applicant, Northern Ohio Telephone Company, should be, and hereby is, authorized to file and make effective General Exchange Tariff P. U. C. O. No. 2, Section 6, Original Sheet No. 1, *however*, at the time of the filing thereof, the Applicant is directed to submit a statement setting forth in detail the additional revenues anticipated to be received thereafter under said revised tariff, subject to verification by the Commission.

(B) Pay Station Rates

The Applicant also proposes to file and make effective Gen-

eral Exchange Tariff P. U. C. O. No. 2, Section 4, Original Sheet No. 4, which in part provides for "a charge of ten cents for each five minutes or fraction thereof is made for each local message from public pay stations in all exchange areas." This Will increase from five (5) to ten (10) cents the rates for calling from public pay stations. The Northern Ohio Telephone Company, in Exhibit E-1 attached to the Supplemental Application, estimates that this rate increase will produce additional revenues in the amount of $14,590.83 annually.

The Commission finds that the Applicant, Northern Ohio Telephone Company, is authorized to file and make effective General Exchange Tariff P. U. C. O. No. 2, Section 6, Original Sheet No. 4, to increase the pay station charge from five (5) to ten (10) cents for each local message from pay stations in all exchange areas, *however*, at the time of the filing thereof, Applicant is directed to set forth in detail the additional revenues anticipated as a result of increasing this charge from five (5) to ten (10) cents, subject to verification by the Commission.
(C) Local Exchange Rates

The proposed rates and charges for Local Exchange Service are set forth in Exhibit C-1 attached to the Supplemental Application. Exhibit E-1 attached to the Supplemental Application shows "Additional Revenue resulting from proposed increases in rates for Local Exchange Service—$1,295,270.80." After certain adjustments Column No. 4, Schedule No. 1, of the Accounting Report, as contained in the Secretary's Report, shows additional revenues of $1,292,231.64.

The Commission finds that the additional revenue resulting from the proposed increases in rates for Local Exchange Service is excessive and such rates and charges should be revised downward.

To arrive at the amount of the allowable "additional revenue" attributable to increased Local Exchange Service Rates and Charges, the following formula is deemed to be applicable.

The sum of:
    (A) Verified additional revenues from
        increased toll rates and charges $    .
    (B) Verified additional revenues from
        increase of pay station rates    $   ,

(C) Balance-additional local service
revenue                                          $        .

*Total* (Additional revenues from all
increased rates and charges.)      $1,083,119.00

(A) + (B) + (C) = $1,083,119.00

In summation, additional annual gross revenues, from all increased rates and charges to customers of the Northern Ohio Telephone Company, in the amount of $1,083,119.00 will produce an annual return of approximately $2,037,000.00 which represents the previously determined 6.05% rate of return on the statutory rate base ascertained herein.

If the estimates of $55,000 submitted by the Company in Exhibit E-1 attached to the Supplemental Application as to the amount of additional revenue resulting from the increase in rates authorized for toll messages processed from origination to destination exclusively over its own facilities; and the additional revenue estimate of $14,590.83 resulting from the increase in pay station rates from five (5) to ten (10) cents can be substantiated and verified at the time of the filing of General Exchange Tariff, P. U. C. O. No. 2, Section 6, Original Sheet No. 1 and General Exchange Tariff P. U. C. O. No. 2, Section 4, Original Sheet No. 4, then rates and charges for Local Exchange Service may be increased accordingly to produce additional revenue of $1,013,528.17.

If, however, the additional revenues resulting from the authorized increase in the rates for toll messages handled from origination to destination exclusively over the facilities of the Northern Ohio Telephone Company exceeds the estimate of $55,000, and the additional revenues resulting from the authorized increase in pay station rates from five (5) to ten (10) cents exceeds the estimate of $14,590.83; then the corresponding dollar reduction is required in the additional revenues to be derived from Local Exchange Service to maintain the determined 6.05% rate of return on the rate base valuation ascertained herein.

The Northern Ohio Telephone Company is authorized to

file and, upon verification thereof by the Commission, make effective at a date to be fixed by Commission Order revised Local Exchange Service rates and charges which would produce an amount of additional annual revenue equivalent to the balance remaining from $1,083,119. after deducting (A) additional revenues resulting from the authorized increases in rates for toll messages handled from origination to destination exclusively over facilities of the Northern Ohio Telephone Company, and (B) additional revenues resulting from the authorized increases in pay station rates, in substitution for Applicant's proposed schedule of increased rates and charges.

### 7. Miscellaneous Items.

(A) Attrition

Attrition was defined by Mr. Henry, President and General Manager of the Northern Ohio Telephone Company as "the dilution of earnings occasioned by the necessity of investing large sums of capital and installing and operating at the present high level of cost, large quantities of equipment and plant to meet the demands for service in rapidly growing areas served by a telephone utility. The continuing increase in average capital investment per station by the Northern Ohio Telephone Company results in a progressive attrition in earnings as stations are added."

While Mr. Henry's testimony alleges dilution of earnings by reason of the increased costs per station added today, the fact remains that all the Applicant's plant and property used and useful in the rendition of telephone service has been revalued at August 31, 1957, price levels pursuant to the specific statutory prescriptions of Ohio law to secure the rate base ascertained herein. Furthermore, the last wage increases, representing substantial expense items of this Company, have been annualized and allowed fully as known increased items of expense by the rates herein authorized. Moreover, as stations are added, additional revenues will be produced at increased rates and charges in both local service revenues and toll revenues.

Also, it is to be noted that the tariff provision hereinbefore authorized permits the Northern Ohio Telephone Company to concur in the Message Toll Telephone Service Tariff of the Ohio Bell Telephone Company on all toll calls *except on toll messages*

*handled from origination to destination exclusively over the facilities of the Northern Ohio Telephone Company,* which means that if this Commission should subsequently authorize increased toll rates for the Ohio Bell Telephone Company, *increased toll rates for all toll calls,* except toll messages handled from origination to destination exclusively over the facilities of the Northern Ohio Telephone Company may then be collected by the Applicant, this, too, would produce additional revenues.

(B) Base Rate Areas

Mr. Henry, President and General Manager of the Northern Ohio Telephone Company, testified that base rate areas are ". . . based on a determination of the area in which there is a continuous residential or business development."

He stated further: "Now, when those areas grow, as they have within the past ten years, by the building of allotments outside of existing base rate area and the progressive increase of corporation lines and the enlargement to take in those areas, we have periodically modified and filed supplements to our base rate areas extending those base rate areas out. For instance, we have recently filed one for the Countryside Addition because of the fact that the extension of continuous urban development has included that area, and whenever a continuous urban development adjacent to an existing base rate area is continuous, in other words, there is no rural area in between, then we file an addition or an amendment in the base rate area regardless of whether it is either in or outside the corporation. Our base rate areas are not determined by corporation limits as such, but they are determined by built-up continuous urban areas adjacent to existing base rate areas."

Local Exchange Tariff, Brunswick, Ohio Exchange, P. U. C. O. No. 2, Section 8-A, Original Sheet No. 2, shows the base rate area of the Brunswick Exchange has not been revised since September 15, 1943. In the meantime, because of the proximity of the recently constructed Chrysler and Ford plants, many additional homes have been constructed in this area, particularly in the last few years.

The Huron, Lodi, Willard, Oak Harbor, and Crestline base rate areas, as set forth in Local Exchange Tariffs P. U. C. O. No. 2, appear to encompass substantially greater areas than the Brunswick base rate area.

The Applicant is directed, therefore, to investigate the propriety of expanding the Brunswick base rate area in conformity with the principles testified to and quoted above, and to file with the Commission the results disclosed by such investigation, within 60 days after the effective date of this Order.

(C) Automatic Disconnects

Complaints were registered at the hearings in this proceeding against the existing and proposed tariff provisions relating to limiting local calls and the practice of terminating local calls by automatic cutoff equipment after seven minutes.

It appears that there is insufficient information in the record of this proceeding to enable the Commission to properly consider the efficacy of such provisions and practices; therefore, the Commission will entertain requests for investigation and consideration as to the propriety of the tariff provisions of the Northern Ohio Telephone Company limiting local calls and the practice of the Northern Ohio Telephone Company of terminating local calls by automatic cutoff equipment after the passage of seven minutes after the telephone number called starts to ring.

(D) Middle Bass Island

In a recent proceeding before the Commission, the Northern Ohio Telephone Company filed an Application with the Commission, being Case No. 27,763 on the Commission's docket, to render telephone public utility service to a new operating territory, Middle Bass Island, at Put-In-Bay exchange rates plus a differential of an additional fifty cents (50c) per month for business primary stations and twenty-five cents (25c) per month for residential primary stations.

The Commission, by its Order dated April 30, 1958, in aforesaid Case No. 27,763, authorized the Northern Ohio Telephone Company to establish telephone public utility service on Middle Bass Island at Put-In-Bay exchange rates plus a differential of an additional fifty cents (50c) per month for business primary stations and twenty-five cents (25c) per month for residential primary stations; and, also authorized this differential to be carried forward into the ultimate disposition of instant case No. 26,681. Accordingly, the Applicant, Northern Ohio Telephone Company, is authorized herein, upon the filing

of its Put-In-Bay local exchange tariff to reflect the increased rates and charges hereinbefore authorized, to carry forward for Middle Bass Island a rate differential over Put-In-Bay rates of an additional fifty cents (50c) per month for business primary stations and twenty-five cents (25c) per month for residential primary stations, this differential being concurred in by the Middle Bass Island subscribers and, otherwise, being in form of a special locality rate.

(F) Banding

Applicant's Exhibit C-1 attached to the Supplemental Application, in addition to setting forth the present and proposed local exchange rates and charges, groups by "Exchanges" the number of telephones in the "local calling area." The practice of such exchange groupings is generally referred to as the "Banding System."

The basis for the groupings, utilized by this Applicant, is the number of telephones (not the number of customers or the number of main services) in each exchange's "local calling area."

A "local calling area" more frequently referred to as a "local service area" may be defined as the area in which telephone subscribers may interchange telephone calls at a flat monthly rate without individual message charges (toll charges). The terms "local calling area" and "exchange area" are *not* synonymous. The number of telephones in a "local calling area" often exceeds the number of telephones in an "exchange area" because of extended area service between "exchange areas."

The Applicant proposes a number of "Bands," generally varying with magneto, common battery, and automatic exchange equipment, coupled with a pattern of size progression with increasing rate levels in going from any one "Band" to the next higher "Band," based upon "telephones" in the "local calling area" as of September 1, 1957.

The system of grouping exchanges into "Bands," as of a date certain, and establishing rates for each exchange area based upon the size of the "local service area" has been approved by the Commission in other telephone rate proceedings. Exchanges, in these other rate proceedings, have been assigned to rate groups at the time of the disposition of the rate pro-

ceeding and continue in the same group, at the same rates, until a subsequent rate adjustment is authorized by the Commission.

It appears to the Commission that the proposed ''Bands'' contain sufficient groups to permit a reasonable spread of rates over the company-wide operation.

(F) Held Orders

The testimony of Mr. Henry discloses that the Northern Ohio Telephone Company has, within the last half of 1957, experienced a continual station gain of from 400 to 500 stations per month. He also testified that 462 orders were received in January of 1958. In connection therewith, he testified to ''the dilution of earnings'' purportedly being realized by his Company because of the increased capital cost of stations added. It is, of course, more expensive to serve certain outlying applicants for telephone service and to expand or reconstruct plant that proved insufficient to meet the enhanced demands and requirements of the public for telephone communication services. However, the Northern Ohio Telephone Company has availed itself, by its application herein, of seeking rate adjustments on a system wide basis which averages out the more expensive plant with the less expensive portion, and the return herein, authorized for this Applicant will yield it reasonable compensation, based upon the statutory rate base valuation, for the rendition of efficient and effective telephone service that should be at all times adequate both quantitatively and qualitatively.

Where held and regrade orders exist, postponements in the prompt filling of such service applications might well evidence failure to provide telephone service that is adequate in quantity and quality.

The return herein authorized, has been granted with an eye to the future considering the pertinent factors applicable to meet the requirements of the Company.

With the return herein authorized this Applicant should have no difficulty in attracting any amount of capital that is reasonably required to do the job of rendering efficient effective telephone service that is at all times adequate throughout all of its operating area.

*Ultimate Findings—*

The Commission renders the following ultimate findings:

(1) That this Application is filed pursuant to, and this Commission has jurisdiction thereof under, the provisions of Sections 4909.17, 4909.18 and 4909.19, Revised Code;

(2) That the investigation required of the Commission by the provisions of Section 4909.18, Revised Code, has been duly made, and the report thereof has been filed and served as required by said statute;

(3) That the Applicant's statutory rate base for the purposes of this proceeding is $33,647,548:

(4) That the fair annual rate of return on said statutory rate base, for the purposes of this proceeding, is 6.05%;

(5) That the dollar annual return to which this Applicant is entitled for the purposes of this proceeding is $2,036,319.47;

(6) That the dollar amount of cost for the Applicant, or its annual expenses for the purposes of this case, with the inclusion of all operating expenses, federal income taxes and other taxes, depreciation charges, maintenance charges, wages, salaries and other operating expenses, aggregate $7,210,606;

(7) That the allowable gross annual revenues, for the purposes of this proceeding, are $9,246,925;

(8) That the Applicant, Northern Ohio Telephone Company, may file General Exchange Tariff P. U. C. O. No. 2, Section 6, Original Sheet No. 1 and at the time of the filing thereof submit a statement detailing anticipated revenues to be received thereunder, subject to verification by the Commission;

(9) That the Applicant, Northern Ohio Telephone Company, may file General Exchange Tariff P. U. C. O. No. 2, Section 6, Original Sheet No. 4 to increase the pay station charge from five (5) to ten (10) cents for each local message from pay stations in all exchange areas and at the time of the filing thereof to set forth in detail the amount of additional revenues anticipated as a result of increasing this charge from five (5) to ten (10) cents, subject to verification by the Commission;

(10) That the Northern Ohio Telephone Company is authorized to establish Local Exchange Rates and Charges by the "Band" grouping basis, assigning exchanges to the "Band" rate group, as of September 1, 1957, with each exchange to continue in its assigned "Band" rate group until otherwise authorized by Order of the Commission; and,

(11) That the Northern Ohio Telephone Company is authorized to file, and upon proper verification thereof by the Commission, make effective revised Local Exchange rates and charges which would produce an amount of additional revenue equivalent to the balance remaining from $1,083,119 after deducting (A) additional revenues resulting from the authorized increases in rates for toll messages from origination to destination exclusively over the facilities of the Northern Ohio Telephone Company, and (B) additional revenues resulting from the authorized increases in pay station rates, in substitution for the Applicant's proposed schedule of increased rates and charges.

*Order*

It is, therefore

Ordered, That in accordance with the Findings and Opinion herein set forth, the Applicant, the Northern Ohio Telephone Company, be, and the same hereby is, authorized to file with this Commission for its approval, adjusted tariff schedules increasing the rates and charges to the subscribers of the Northern Ohio Telephone Company, in the amount of $1,083,119.00, which will provide said Applicant with a total gross annual revenue of approximately $9,246,925.00. It is further

Ordered, That such tariff schedules may become effective subsequent to their approval by this Commission or upon such subsequent date as the Commission may designate.

The Public Utilities Commission of Ohio

Entered in the Journal: Everett H. Krueger, Jr., Chairman
May 21, 1958 Ralph A. Winter
A true copy: Edward J. Kenealy
W. E. Herron Commissioners
W. E. Herron, Secretary